Mark K. Schonfeld
Regional Director (MS-2798)

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, New York 10281
(212) 336-1020



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                       Plaintiff,

     -against-

ANDREW J. MCKELVEY,

                    Defendant.

08 Civ. CV 0555

---

Plaintiff Securities and Exchange Commission ("Commission") alleges the following against Defendant Andrew J. McKelvey ("McKelvey" or the "Defendant"):

## SUMMARY

1.     McKelvey, the Chief Executive Officer of Monster Worldwide, Inc. ("Monster" or the "Company"), participated in a fraudulent stock option backdating scheme. McKelvey and others backdated the grant dates of stock options to coincide with the dates of low closing prices for the Company's common stock, resulting in grants of in-the-money options to numerous employees, officers and directors. The fraudulent conduct of McKelvey and others caused Monster to make disclosures in its periodic filings and proxy statements that falsely portrayed Monster's options as having been granted at exercise prices equal to the fair market value of

Monster's common stock on the date of the grant, when, in fact, Monster was granting in-the-money options.

2.     More specifically, when making "Broad-Based Grants" of options to numerous recipients, McKelvey, among others at Monster, would select a low closing stock price at which the Company wanted to grant stock options. Employees then prepared backdated documentation for Monster's Compensation Committee containing the grant date that coincided with the low closing price for Monster's common stock. This documentation made it appear that the Compensation Committee authorized the grant of options on the purported grant date. In fact, the Compensation Committee did not take any such action. Rather, the Compensation Committee did not approve the grant of options until long after the purported grant date. With respect to "One-Off Grants," option grants to new employees or to current employees in connection with special achievements, McKelvey, among others at Monster, selected low stock closing prices at which to grant these options. Various individuals then backdated documentation for Monster's Compensation Committee to make it appear that the Committee had acted on the purported grant date, when, in fact, the Committee had not.

3.     McKelvey understood that backdating options to coincide with low closing prices for Monster stock without recognizing a compensation expense was contrary to accounting rules and contrary to representations in Monster's SEC filings.

4.     McKelvey's fraudulent conduct caused Monster to file materially false and misleading public reports that contained financial statements that materially understated the Company's compensation expenses and materially overstated its quarterly and annual net income. Indeed, McKelvey knew, or was reckless in not knowing, that these public filings were false and misleading when he reviewed and signed them. On December 13, 2006, Monster

restated its historical financial results for 1997-2005 in a cumulative pre-tax amount of approximately $339.5 million to record additional non-cash charges for option related compensation expense.

5.     McKelvey benefited from the fraudulent scheme. For example, McKelvey arranged for Monster to grant backdated options to at least four of his personal employees (e.g., his pilots and a mechanic) as compensation.

## JURISDICTION AND VENUE

6.     The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

7.     The Defendant, directly or indirectly, used the means and instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the acts, transactions, practices and courses of business alleged herein.

8.     Venue is proper because Monster maintained an office in New York, New York at all relevant times, and certain of the acts, transactions, practices and courses of business alleged herein took place in the Southern District of New York.

## STATUTES AND RULES VIOLATED

9.     McKelvey has engaged, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices, and courses of business that constitute violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b), 13(b)(5) and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5) and 78n(a)], and Rules 10b-5, 13a-14, 13b2-1,

13b2-2 and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, 240.13b2-2 and 240.14a-9] thereunder.

10.    McKelvey has also engaged, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices, and courses of business that aided and abetted Monster's violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)], and Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13] thereunder.

11.    The Defendant should be permanently enjoined from violating the provisions of the securities laws described above and ordered to disgorge any ill-gotten gains or benefits derived as a result of his violations (whether realized, unrealized or received) and prejudgment interest thereon. McKelvey should be ordered to pay civil penalties. In addition, McKelvey should be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]. The Court should also order any other just and appropriate relief.

## THE DEFENDANT

12.    **Andrew J. McKelvey**, 73, a resident of New York, New York, founded Monster in 1967 and was most recently Chairman of the Board of Directors and CEO. On October 9, 2006, Monster announced that McKelvey resigned as Chairman and CEO at Monster due to the pressures of the ongoing investigation into options backdating, but would remain as a member of the Board of Directors and its Chairman Emeritus. On October 30, 2006, McKelvey resigned these positions as well.

## THE COMPANY

13.    **Monster Worldwide, Inc.**, formerly known as TMP Worldwide Inc., is a Delaware corporation that is the parent company of Monster.com, a leading global online career and recruitment resource. The Company, headquartered in New York, New York, employs approximately 4,600 employees in 35 countries. Monster's common stock is currently registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the NASDAQ National Market System under the symbol "MNST." The Company's initial public offering of shares of its common stock occurred on December 12, 1996.

## FACTS

14.    McKelvey, among others, backdated the vast majority of stock options that Monster granted. Monster's public filings did not accurately describe the Company's stock option practices. Additionally, most of Monster's option grants were in-the-money on the day they were granted and therefore had an immediate compensatory component that Monster failed to expense properly and otherwise failed to disclose to shareholders. Monster's backdating scheme continued until approximately April 2003.

15.    Throughout the relevant period, McKelvey understood that backdating stock option grants was improper. The Defendant also understood that because Monster was issuing in-the-money options, the Company was required to recognize, but did not recognize, a compensation expense for these options.

### The Monster Stock Option Plans

16.    From 1996 through 2003, Monster had two relevant stock option plans.

17.    Effective as of January 3, 1996, Monster adopted the TMP 1996 Employee Stock Option Plan (the "1996 Plan").

18.    The 1996 Plan provided that a Compensation Committee consisting of at least two directors would administer the plan.  Subject to the provisions of the plan, the Compensation Committee had absolute discretion to grant options and set and interpret the provisions of option agreements.

19.    The 1996 Plan stated that for a non-qualified stock option ("NQSO"), which comprised the vast majority of options at Monster awarded, the exercise price per share could not be less than the par value of a share of common stock on the date the option was granted.

20.    The 1996 Plan stated that for an incentive stock option ("ISO"), the exercise price per share could generally not be less than the fair market value of a share of common stock on the date the option was granted.   Through a series of amendments, the 1996 Plan authorized the award of 3 million shares.  In addition, the 1996 Plan stated that only officers, directors or employees of Monster, or affiliates or consultants, were eligible to receive option awards.

21.    Effective as of December 9, 1998, Monster adopted the TMP 1999 Long Term Incentive Plan (the "1999 LTIP"), authorizing the award of up to 15 million shares plus the number of shares remaining available for awards under the 1996 Plan.

22.    Similar to the 1996 Plan, a Compensation Committee, comprised of at least two independent directors, which had absolute discretion to make grants, was to administer the 1999 LTIP.  Likewise, the 1999 LTIP contained the same parameters for the exercise price of a NQSO and ISO, and included the same categories of persons eligible to receive option awards, except the 1999 LTIP also included independent contractors who provided services to Monster.

### *Accounting For Options Under*
### *Generally Accepted Accounting Principles ("GAAP")*

23.    From 1996 through 2005, Monster accounted for stock options using the intrinsic method described in Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued

to Employees" ("APB 25"). Under APB 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date." The measurement date, as defined by APB 25, is the first date on which the following information is known: (i) the number of options that an individual employee is entitled to receive and (ii) the exercise price. An option that is in-the-money on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option. Options that are at-the-money or out-of-the-money on the measurement date need not be expensed.

### The Option Granting Process At Monster

24.    Monster's option grants fell into two main categories: (i) options granted to a large number of recipients, including rank and file employees ("Broad-Based Grants"); and (ii) options granted to newly-hired employees, new employees from Monster's acquisition of other companies, or current employees in connection with promotion, retention or meeting productivity goals ("One-Off Grants").

25.    During the relevant period, the Compensation Committee approved the vast majority of stock option grants through the use of a unanimous written consent ("UWC").

26.    The UWCs describe the grants including the exercise price, contain an "as of" date, purportedly indicating the date on which the Compensation Committee approved the stock option grants, and typically refer to an attached Schedule A. The Schedule A was intended to be a separate document listing the names of the grantees and the number of shares subject to each option.

27.    For much of the relevant period, Monster's Human Resources Department ("HR") tracked its option grants through an electronic database known as "Transcentive." To enter a

7

stock option grant into Transcentive, HR was required to input the optionee's name, social security or other identification number, the number of shares, exercise price and vesting schedule of the relevant option. Without all of this information, Transcentive would not accept the entry. Once HR input an option grant entry into Transcentive, key fields such as Grant Date, Option Price and Total Shares per Grant for a particular grant could not be modified without complete deletion of the entry and the inputting of a new entry with the amended data.

28.    HR would typically enter information about particular Broad-Based Grants and One-Off Grants into the Transcentive system after it had all of the necessary information for the grants.

29.    As will be described below, based on his involvement in the option grant process, McKelvey knew, or was reckless in not knowing, that the UWCs were false because the "as of" dates did not represent the true option grant dates. McKelvey knew, or was reckless in not knowing, that the Compensation Committee had not authorized the option grants on the "as of" dates. In fact, Monster frequently did not even determine who would receive options and what their allocations would be until long after the UWCs' "as of" dates, and accordingly, there was no way the Compensation Committee could have authorized the grants until a much later date.

### Monster's Backdated Broad-Based Grants

30.    With regard to Broad-Based Grants, before any approval by the Compensation Committee, McKelvey or another senior officer communicated the grant date and/or exercise price to HR based upon a recent low closing price for Monster's stock.

31.    McKelvey or another senior officer then determined the number of options to be granted to senior management and the number of options to be allocated to each division at Monster.

32.     For most Broad-Based Grants, HR then circulated memoranda to each of Monster's various divisions that contained the exercise price, and set a deadline for the divisions to allocate the options amongst their employees and provide their options allocations to HR.

33.     Once HR received the allocations from the divisions, Monster's general counsel, Myron Olesnyckyj ("Olesnyckyj"), or HR would complete the documentation for the grants, which often had a purported grant date from months earlier.

34.     For example, the Compensation Committee purportedly approved a Broad-Based Grant pursuant to a UWC, with a Schedule A attached, dated "as of" December 9, 1998 at the closing price of $26.875.

35.     A meeting took place on January 15, 1999 during which McKelvey stated that he wanted to grant options at an exercise price of $25. Subsequent to this meeting, a Monster employee chose the December 9 closing price of $26.875, the closest closing price to $25 since December 1, as the grant date and exercise price.

36.     On February 26, 1999, HR distributed a memorandum throughout Monster announcing the exercise price for the grant and apprising division heads of the method to allocate options amongst employees. The memorandum stated that the allocations of these options were due back to HR by March 12, 1999.

37.     Monster did not complete the list of individuals who would receive options, and what their allocations would be, until after March 12, 1999. Accordingly, the Compensation Committee could not have approved these option grants until after March 12, 1999.

38.     The closing price on December 9, 1998 was the lowest closing price for Monster stock from December 1, 1998 through the end of April 1999.

9

39.    In another example, the Compensation Committee purportedly approved a Broad-Based Grant pursuant to a UWC dated "as of" December 1, 1999 at the closing price of $95. This grant date is notable because the next day, December 2, 1999, was the second largest percentage increase in Monster's stock price in the history of the Company due to the announcement of a transaction between Monster and America Online.

40.    On January 19, 2000, HR distributed a memorandum to Monster's division heads, announcing that the strike price was $95, and asking for their options allocations by February 18, 2000. McKelvey was cc'd on this memorandum.

41.    Monster did not complete the list of individuals who would receive options, and what their allocations would be, until after February 18, 2000. Accordingly, the Compensation Committee could not have approved these option grants until after February 18, 2000.

42.    The December 1, 1999 closing price of $95 was the lowest strike price from December 1, 1999 through February 29, 2000.

43.    Further, from approximately October 31, 1999 to February 18, 2000, the full Board of Directors acted as the Compensation Committee. Thus, as a member of the Board, McKelvey acted as a member of the Compensation Committee during this time period.

44.    McKelvey signed multiple UWCs from October 31, 1999 to February 18, 2000, including UWCs for the Broad-Based Grant purportedly approved on December 1, 1999, as well as One-Off Grants purportedly approved on November 10, 1999, January 5, 2000, January 14, 2000 and January 24, 2000. As discussed above, the December 1, 1999 UWC was backdated because a list of the grantees and their option allocations for this Broad-Based Grant could not have been completed until after February 18, 2000. Accordingly, McKelvey knew that he did not adequately approve the Broad-Based Grant "as of" December 1, 1999.

10

45.    In its public filings, Monster did not disclose that it was granting in-the-money options through the Broad-Based Grant process. Monster also did not generally record a compensation expense for the in-the-money options it was granting through the Broad-Based Grant process.

### Monster's Backdated and Unauthorized One-Off Grants

46.    The internal process at Monster was somewhat different with respect to One-Off Grants. In the late 1990s, McKelvey or HR would notify Olesnyckyj of the terms of One-Off Grants, including the purported grant date and/or exercise price of the grant. Olesnyckyj would then obtain the list of option grantee(s) from McKelvey or another senior officer, or HR. After that, Olesnyckyj would send the UWCs and (sometimes) Schedule As to the Compensation Committee.

47.    In late 1999, primary responsibility for options paperwork was transferred from Olesnyckyj to HR. In early 2000, HR created forms to be used for approval of One-Off Grants. In order to have a One-Off Grant approved, an officer or an employee would fill out an approval form with the name of the proposed grantee(s), the specific number of options proposed for each grantee, and a proposed grant date and exercise price. The relevant division head would then sign the approval form and forward the form to McKelvey or other senior officer for signature. Once signed, the form was forwarded to HR for processing. Nothing was sent to the Compensation Committee for approval until after McKelvey or another senior officer signed the form.

48.    With respect to the vast majority of One-Off Grants, the purported grant dates precede the date on which the Compensation Committee approved the grants by days, weeks and even months.

11

49.    Monster did not disclose that it was granting in-the-money options through the One-Off Grant process. Monster also generally did not record a compensation expense for the in-the-money options it was granting through the One-Off Grant process.

50.    There were many One-Off Grants from 1997 through April 2003. The vast majority of these grants were backdated, and the Compensation Committee did not approve the option grants on the purported grant date. McKelvey and others participated in the backdating of these One-Off Grants.

51.    For example, McKelvey drafted a memorandum dated January 5, 1999 to a long-time Monster executive. In an effort to convince this executive to stay at Monster, McKelvey promised in the memo that the executive would receive 50,000 options and "the stock price should be the lowest stock price of December 1998." This executive received options "as of" December 9, 1998, the lowest price in December 1998.

52.    In early 1999, a Monster employee realized that he had only been granted 24,604 options "as of" January 6, 1997. He claimed that Monster owed him an additional 8,000 options from this same grant. Over two years after the grant, McKelvey agreed to grant the employee an additional 8,000 options with a grant date of January 6, 1997. The Compensation Committee, however, only approved 24,604 options for this employee on the purported January 6, 1997 grant. No further Compensation Committee approval was sought for the grant of the additional 8,000 options. Olesnyckyj prepared the stock option agreement for these additional options and forwarded it to HR on July 9, 1999. The employee received these additional 8,000 options "as of" January 6, 1997.

53.    Further, on November 13, 2001, McKelvey emailed HR and directed that a senior officer at Monster receive 100,000 options "at the lowest price in November" with no mention of

Compensation Committee approval. That officer received 100,000 shares "as of" November 1, 2001.

54.    From 2000 through 2002, there were also a number of proposals by Monster's Executive Search division to use in-the-money options instead of cash to compensate employees within that division. McKelvey was aware of these proposals and helped implement them.

55.    On or about October 15, 2001, the officers of the Executive Search division met with McKelvey to discuss the financial projections for the division. When a senior officer in the Executive Search division told McKelvey that the division would not meet the financial projections for the fourth quarter of 2001, McKelvey stated that he was not asking the division to make its numbers, but rather was *telling* the division to make its numbers.

56.    In an effort to cut costs, on October 19, 2001, the Executive Search division proposed in an email that Monster use in-the-money options instead of cash for bonuses due to eight employees in that division for the fourth quarter of 2001. The October 19 email suggested a strike price at the lowest price of the quarter to date. On October 30, Olesnyckyj responded by email that "AJM confirmed a few minutes ago that he has no objections…" Other senior officers at Monster also approved this proposal.

57.    Monster then granted at least seven of the eight executive search employees these options as part of the purported October 2, 2001 grant with an exercise price of $27.24, the lowest stock price for the quarter. There could not have been Compensation Committee approval for this grant until well after October 2, 2001.

### McKelvey Knew, or Was Reckless in not Knowing, that Backdating was Improper

58.    McKelvey understood that backdating options to coincide with low closing prices for Monster stock without recognizing a compensation expense was contrary to accounting rules and contrary to representations in Monster's SEC filings.

59.    McKelvey signed and reviewed Monster's Forms 10-K that explicitly discussed APB 25 and stated that Monster complied with its provisions.

60.    McKelvey understood the proper stock option grant process. McKelvey knew that the Compensation Committee had to approve all aspects of each grant and that the exercise price of the grant should be the closing price of the stock on the date the Compensation Committee approved the grant in order to avoid having to take a compensation expense.

### McKelvey Benefited From the Scheme

61.    Although McKelvey never received options, from 1999 through April 2003, he benefited in other ways.

62.    For example, from 1999 through 2002, McKelvey caused Monster to grant backdated options to four individuals McKelvey personally employed, including three pilots and a mechanic. With the exception of one person's options, which were cancelled when that person left McKelvey's employ, Monster considered these to be vested options. Indeed, three of these individuals have exercised some of their options.

### Monster's Materially False and Misleading Forms 10-K, 10-Q and 8-K

63.    Each of Monster's Forms 10-K for fiscal years 1997 through 2005, and each of Monster's Forms 10-Q during the same period, materially understated Monster's compensation expenses and materially overstated the Company's net income because Monster failed to expense the in-the-money portion of its stock option grants during that period as APB 25 required.

64.    From approximately 1997 through 2001, Monster's Forms 10-K falsely stated that it "accounts for its stock option awards under the intrinsic value based method of accounting prescribed by Accounting Principles Board Opinion No. 25, 'Accounting for Stock Issued to Employees.' Under the intrinsic value based method, compensation cost is the excess, if any, of the quoted market price of the stock at grant date or other measurement date over the amount an employee must pay to acquire the stock."

65.    In addition, in its Forms 10-K for the years 1997 through 2000, Monster falsely stated that "Under APB 25, because the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized."

66.    From 2002 through 2005, Monster's Forms 10-K falsely stated that "The Company's financial statements are presented in accordance with the Accounting Principles Board's Opinion No. 25, Accounting for Stock Issued to Employees. Under APB No. 25, generally, no compensation expense is recognized in connection with the awarding of stock option grants to employees provided that, as of the grant date, all terms associated with the award are fixed and the quoted market price of the stock is equal to or less than the amount an employee must pay to acquire the stock as defined. As the Company only issues fixed term stock option grants at or above the quoted market price on the date of the grant, there is no compensation expense recognized in the accompanying combined financial statements."

67.    Further, in 1997 and 1998, Monster's Forms 10-K outlined the grant details, including the purported date, for each of the option grants those years. That information was false.

15

68.    Monster did not present its financial statements from 1997 through 2005 in accordance with APB 25 because Monster did not record compensation expense for the in-the-money options it granted. In fact, Monster's restatement of its financial statements disclosed that Monster's compensation expense was understated by approximately $339.5 million pre-tax, $272 million after tax, during the period 1997 through 2005.

69.    Because Monster did not record the appropriate compensation expense for the in the money options, Monster's aggregate net income, as reported in its Forms 10-K, was overstated. For example, Monster's Form 10-K for 2001 reported that Monster's net income was $69,020,000. After Monster took the appropriate compensation expense, however, the Company's net income dropped to $3,439,000, as reported in the restatement. Consequently, Monster's net income for 2001 was overstated by over 1900%.

70.    From 1997 through 2005, Monster's Forms 10-Q were also misleading because, among other things, the financial statements did not reflect the correct compensation expense for the in-the-money options Monster granted.

71.    In addition, beginning in the Form 10-Q for the second quarter of 2003, each Form 10-Q included the following disclosure: "The Company accounts for employee stock-based compensation in accordance with APB No. 25. Under APB No. 25, no compensation expense is recognized in connection with the awarding of stock option grants to employees provided that, as of the grant date, all terms associated with the award are fixed and the quoted market price of the stock is equal to or less than the amount an employee must pay to acquire the stock. As the Company only issues fixed term stock option grants at or above the quoted market price on the date of the grant, there is no compensation expense recognized in the accompanying financial statements."

72.    From 1997 through 2005, some of Monster's Forms 8-K were misleading. At least six of Monster's current reports filed on Forms 8-K contained disclosure language concerning APB 25. Monster's current Forms 8-K filed on March 17, 1999, April 21, 1999, June 10, 1999, September 30, 1999, December 2, 1999 and July 21, 2000 contained the following disclosure: "The Company applies Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" (APB 25) and related Interpretations in accounting for its employee stock options. Under APB 25, because the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized."

73.    In addition, Monster's Forms 8-K that contained financial statements from 1997 through 2005 were misleading because the financial statements, among other things, did not reflect the correct compensation expense for in-the-money options.

74.    McKelvey reviewed and signed, or directed someone to sign on his behalf, annual reports on Forms 10-K filed by Monster for the years 1997 through 2005. Beginning in the third quarter of 2002, McKelvey reviewed and signed, or directed someone to sign on his behalf, quarterly reports on Forms 10-Q filed by Monster.

75.    In addition, McKelvey signed certifications required by the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"). McKelvey signed these certifications for the Forms 10-K for the years 2002 through 2005, and for the Forms 10-Q beginning with the third quarter of 2002.

76.    McKelvey understood the requirement to sign the Sarbanes-Oxley certifications. Olesnyckyj drafted a memorandum to McKelvey dated July 17, 2002 stating, in pertinent part, "the SEC issued an order requiring the CEO and CFO of all public companies with revenues over $1.2 billion (including TMP) to personally certify under oath to the SEC that certain filings

17

relating to fiscal 2001 and thereafter are accurate and complete." Olesnyckyj enclosed with that memorandum a brief memo from Monster's outside counsel summarizing the SEC requirement as well as copies of previously made SEC filings that McKelvey was required to review for purposes of the certification, including the Form 10-K for 2001, the Form 10-Q for the first quarter of 2002, the proxy statement dated May 17, 2002 as wells as various Forms 8-K.

77.    McKelvey knew, or was reckless in not knowing, that these public filings were materially false and misleading.

### *Monster's Materially False and Misleading Proxy Statements*

78.    Monster sent shareholders proxy statements in connection with its annual shareholder meetings during the period 1997 through 2003.

79.    Monster's proxy statements were signed by order of the Board of Directors and McKelvey was a director during this time period.

80.    The Monster proxy statements that were sent to shareholders in connection with the annual shareholders' meeting included discussions about: (i) the election of directors, and (ii) the approval and adoption of Monster's stock option plans and amendments thereto.

81.    The proxy statements filed from 1997 through 2003 falsely represented in the "Executive Compensation" section that options had been granted to Monster's top executives in previous years on particular dates when those dates were not, in fact, the dates that the Compensation Committee approved the grant. These proxy statements also failed to disclose that the option grants were in-the-money at the time of the grants.

82.    In the proxy statements, shareholders were asked to approve amendments to the 1996 Plan and the adoption of the 1999 LTIP, both of which gave the Compensation Committee sole and absolute discretion to determine the identity of option grantees and the size and terms of

option grants. In asking shareholders to approve plans with those provisions, the proxy statements failed to inform shareholders that Defendants and others routinely backdated grants and processed other grants without ever seeking Compensation Committee approval.

83.     Further, Monster's proxy statement filed May 14, 1999 stated that the Compensation Committee adopted the 1999 LTIP on December 9, 1998 and that the 1999 LTIP authorized 15 million shares. The Compensation Committee, however, did not take any such action on December 9, 1998.

84.     Monster's proxy statements were incorporated in Monster's Forms 10-K.

85.     McKelvey knew, or was reckless in not knowing, that there were materially false and misleading statements in these proxy statements.

### *Monster's Materially False and Misleading Registration Statements*

86.     Between December 1996 and April 2003, a number of Monster's registration statements became effective including a Form S-1 effective in September 1997, a Form S-4 effective in July 1999 and various Forms S-8.

87.     These registration statements incorporated by reference materially false and misleading financial statements, as well as materially false and misleading disclosures, from Monster's Forms 10-K, 10-Q and 8-K, and proxy statements.

88.     In addition, McKelvey reviewed and signed, or directed someone to sign on his behalf, a Form S-1 effective in September 1997, a Form S-4 effective in July 1999, and certain of the Forms S-8.

89.     McKelvey knew, or was reckless in not knowing, that there were materially false and misleading statements in these registration statements.

*Materially False and Misleading Statements to Monster's Auditors*

90.    McKelvey misled Monster's outside auditors in an attempt to hide the backdating scheme.

91.    In addition to the events discussed above, beginning in 2001, McKelvey signed management representation letters in connection with the annual audits and quarterly reviews of Monster that he knew, or was reckless in not knowing, contained false and misleading statements.

92.    For example, in the management representation letters, McKelvey falsely represented that the financial statements were presented in conformity with GAAP, despite his knowledge that Monster did not record the correct compensation expense for the in-the-money options the Company granted.

93.    McKelvey also falsely represented in the management representation letters that there had been no fraud involving management or employees who have significant roles in internal controls.

94.    In addition, the management representation letters state that an attached schedule "constitutes a complete and accurate listing of all unanimous consents and resolutions of the board of directors and its committees" during the time period covered by the letter. The attached schedule, however, was not accurate.

95.    McKelvey reviewed and signed the management representation letters from 2001 through 2005.

20

### *Monster's Books and Records*

96.     By virtue of McKelvey's misconduct, Monster's books and records falsely and inaccurately reflected, among other things, the dates of option grants, the Company's stock-based compensation expenses, and the Company's financial condition.

97.     McKelvey signed UWCs that contained false option grant dates. He regularly approved grants of options or directed that grants be made after the purported "as of" grant date.

### CLAIMS FOR RELIEF

### COUNT ONE
### (Violations of Section 17(a) of the Securities Act)

98.     The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 97 above.

99.     Defendant McKelvey, directly or indirectly, knowingly, recklessly, or negligently, in the offer or sale of Monster securities, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers of Monster securities.

100.    By engaging in the conduct alleged above, defendant McKelvey violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**COUNT TWO**
**(Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Thereunder)**

101.    The Commission realleges and incorporates by reference each and every

allegation contained in Paragraphs 1 through 100 above.

102.    Defendant McKelvey, directly or indirectly, by use of the means or instruments of

interstate commerce, or of the mails, or of a facility of a national securities exchange, knowingly

or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements

of a material fact or omitted to state a material fact, necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading; or (c) engaged

in acts, transactions, practices, or courses of business which operated or would operate as a fraud

or deceit upon any person, in connection with the purchase or sale of securities.

103.    By engaging in the conduct alleged above, defendant McKelvey violated Section

10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]

thereunder.

**COUNT THREE**
**(Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Thereunder)**

104.    The Commission realleges and incorporates by reference each and every

allegation contained in Paragraphs 1 through 103 above.

105.    Defendant McKelvey, by the use of the mails or by any means or instrumentality

of interstate commerce or of any facility of a national securities exchange or otherwise,

knowingly, recklessly or negligently, solicited by means of a proxy statement, form of proxy,

notice of meeting or other communication, written or oral, containing statements which, at the

time and in light of the circumstances under which they were made, were false and misleading

with respect to material facts, or omitted to state material facts necessary in order to make the

statements therein not false or misleading or necessary to correct statements in earlier communications with respect to the solicitation of the proxy for the same meeting or subject matter which was false or misleading.

106.    By engaging in the conduct alleged above, defendant McKelvey violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 [17 C.F.R. § 240.14a-9] thereunder.

## COUNT FOUR
**(Violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 Thereunder)**

107.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 106 above.

108.    Defendant McKelvey knowingly circumvented a system of internal accounting controls and/or knowingly falsified books, records or accounts.

109.    Defendant McKelvey, directly or indirectly, falsified or caused to be falsified books, records or accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

110.    By engaging in the conduct alleged above, defendant McKelvey violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1] thereunder.

## COUNT FIVE
**(Violations of Exchange Act Rule 13b2-2)**

111.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 110 above.

112.    Defendant McKelvey directly or indirectly, (i) made, or caused to be made, materially false or misleading statements or (ii) omitted to state, or caused others to omit to state,

material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, to an accountant in connection with an audit, review or examination of financial statements or the preparation or filing of a document or report required to be filed with the Commission. McKelvey was an officer of Monster at relevant times following the IPO.

113.   By engaging in the conduct alleged above, defendant McKelvey violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

**COUNT SIX**
**(Aiding and Abetting Monster's Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 Thereunder)**

114.   The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 113 above.

115.   Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.13a-1, 240.13a-11 and 240.13a-13] thereunder, require issuers of registered securities to file with the Commission factually accurate annual, quarterly and current reports. Rule 12b-20 [17 C.F.R. § 240.12b-12] further provides that, in addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they were made not misleading.

116.   Monster violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13] thereunder.

117.   By engaging in the conduct alleged above, defendant McKelvey knowingly provided substantial assistance to Monster in its violations of Section 13(a) of the Exchange Act

[15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13] thereunder.

118.    By engaging in the conduct alleged above, defendant McKelvey aided and abetted Monster's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13] thereunder.

### COUNT SEVEN
#### (Aiding and Abetting Monster's
#### Violations of Section 13(b)(2)(A) of the Exchange Act)

119.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 118 above.

120.    Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires issuers to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets.

121.    Monster violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A)].

122.    By engaging in the conduct alleged above, defendant McKelvey knowingly provided substantial assistance to Monster in its violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A)].

123.    By engaging in the conduct alleged above, defendant McKelvey aided and abetted Monster's violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A)].

### COUNT EIGHT
#### (Violation of Exchange Act Rule 13a-14)

124.    The Commission realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 123 above.

125.    Defendant McKelvey certified in each Monster quarterly and annual report filed between September 2002 and December 2005 that, among other things, he reviewed each of these reports and, based on his knowledge, these reports (i) did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading and (ii) included financial statements and other financial information which fairly presented, in all material respects, Monster's financial condition, results of operations and cash flows.

126.    By engaging in the conduct alleged above, defendant McKelvey violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court enter a judgment:

### I.

Permanently restraining and enjoining defendant McKelvey from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b), 13(b)(5) and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(b)(5) and 78n(a)] and Rules 10b-5, 13a-14, 13b2-1, 13b2-2 and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, 240.13b2-2 and 240.14a-9] thereunder, and from aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)], and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13 ] thereunder.

### II.

Ordering defendant McKelvey to disgorge, with prejudgment interest, all ill-gotten gains, compensation, and benefits (whether realized, unrealized or received) by virtue of the conduct alleged herein.

## III.

Ordering defendant McKelvey to pay civil money penalties pursuant to Section 20(a) of the Securities Act [15 U.S.C. § 77t(a)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## IV.

Prohibiting defendant McKelvey from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## V.

Granting such other and further relief as this Court may determine to be just and appropriate.

Dated: January 23, 2008
New York, New York

MARK K. SCHONFELD (MS-2798)
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
New York, New York 10281-1022
Tel: 212-336-1020

Of Counsel:

Kay L. Lackey (Not admitted in New York)
Robert H. Murphy
Jennifer C. Loach